DE LA VILLEBEUVE (NORTON v.). See Case No. 10,350.

## Case No. 3,760.

### The DELAWARE.

[1 Biss. 110.][1]

Circuit Court, N. D. Ohio. July Term, 1856.

COLLISION — CONFLICTING EVIDENCE — DUTY OF VESSELS MEETING—DUTY OF STEAMER—TRINITY RULES DEFECTIVE.

1. In cases of collision, the hypotheses and evidence of the respective parties are generally in-

---

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission. 20 Alb. Law J. 336, contains only a partial report.]

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

consistent. When there is a change in the course of a vessel, a person without a compass, standing on the deck of either cannot, generally, say whether the change has been made by the vessel on which he stands, or the one on which his eye is fixed.

2. A vessel that has the wind free, or is sailing before or with the wind, must get out of the way of the vessel close-hauled or sailing by or against it; and the vessel on her starboard tack has a right to keep on her course.

3. So a steam vessel must get out of the way of a sail vessel, on the same principle, that the steam power gives the control of the vessel, as a vessel with the wind free. The exact variations of a vessel, from her general course, can only be known by the compass.

4. Where the light of a sail vessel appears to a steam vessel, at a distance of three or four miles, such light should be observed closely, in order that the steamer may avoid the vessel which carries it. The steamer is bound to port its helm, and make way for a sail vessel where there is the least possibility of danger.

5. It is negligence in the steamer not to guard against the contingencies of a shifting wind, and the accidents to which a sailing vessel is liable; the point of danger is not passed until the vessels have passed each other. And although such vessel may change its course from apprehension of danger, the steamer is in fault for not keeping out of the way, although the sail vessel may not be faultless. In such a case there is a mixed fault, and the damage done from a collision should be divided between the parties.

6. The trinity rules, sanctioned by the supreme court, were designed chiefly for the government of vessels on the Thames, and in their application in this country are defective. The defects consist in the conditional application of the rules. Some instances stated.

7. A rule of navigation should be simple, plain, and absolute.

[Appeal from the district court of the United States for the northern district of Ohio.]

Spalding & Parsons, for libellant.
Carter & Morton, for respondent.

McLEAN, Circuit Justice. The libellant states, that on the 11th of June, 1855, at half past eight o'clock in the afternoon, the schooner E. M. Lyon sailed from Cleveland, loaded with one hundred and forty tons of coal on a voyage to Toledo; that about fifteen miles westerly from Cleveland, at about half past two o'clock at night, she was run into and sunk by the propeller Delaware, which caused the loss of the schooner and her cargo. The propeller was on her course from the Middle Ross island to Cleveland.

The hypotheses of the respective parties are inconsistent with each other, in each charging the other with being the cause of the collision; and as usual in such cases, the officers and crew of each vessel, in their evidence, sustain the assumptions of each. This conflict of testimony in collision cases is not supposed to arise, altogether from a disposition to misrepresent the facts in justification or excuse of their own conduct; but from the uncertainty of the course and position of the vessels, before and at the time of the collision. No one standing upon the deck of a vessel, without a compass, can observe a small deviation from its general course. An experienced seaman having a fixed object ahead, by ranging with certain parts of the vessel, or from the stars, may see where deviations are made; but the changes cannot be noted with mathematical precision. Much less certainty can be attained, when the object ahead is a moving vessel. Whether a perceptible change in the course is caused by the vessel on which the observer stands, or the one on which his eye is fixed may be a matter of doubt. This difficulty is greatly increased at night when the wind is fresh, as the waves have some effect on a vessel propelled by steam, and a much greater effect upon a sail vessel. The lights of vessels at night may show their relative positions, but without reference to the compass they do not indicate the precise course of either.

It may be proper here to state the rules recommended by the trinity masters in England, and approved by the supreme court in the case of St. John v. Paine, 10 How. [51 U. S.] 581: "A vessel that has the wind free or sailing before or with the wind, must get out of the way of the vessel that is close-hauled or sailing by or against it; and the vessel on the starboard tack has a right to keep her course, and the one on the larboard tack must give way, or be answerable for the consequences. So when two vessels are approaching each other, both having the wind free and consequently the power of readily controlling their movements, the vessel on the larboard tack must give way, and each pass to the right. The same rule governs vessels sailing on the wind and approaching each other, when it is doubtful which is to windward. But if the vessel on the larboard tack is so far to windward that, if both persist in their course, the other will strike her on the lee side abaft the beam or near the stern, in that case the vessel on the starboard tack should give way, as she can do so with greater facility and less loss of time and distance than the other. Again when the vessels are crossing each other in opposite directions, and there is the least doubt of their going clear, the vessel on the starboard tack should perserve in her course, while that on her larboard tack should bear up or keep away before the wind." A great many authorities are cited in the above case, as sanctioning these rules.

In a conflict of testimony, the number of witnesses on the respective sides may not be wholly disregarded; but there are often circumstances which should have a more controlling influence than the fact of numbers. Respectability of character, as is sometimes perceived from the manner of relating facts, a favorable position for observation, the danger apprehended at the moment, and the admissions of the parties must all be duly considered.

The crew of the schooner consisted of some

six persons, the master, mate, cook and three person before the mast. These witnesses agree in saying the night of the collision was bright and starlight, that about midnight Thomas R. Willis, the mate, took charge of the larboard watch, relieving the captain, who directed the course of the vessel should be west by north as long as the wind held on at the southward. A man by the name of Allen was at the helm, Nicholas Burke, the captain's brother was also on deck.

At about two o'clock a light breeze blew from the northward, the schooner was steered west-north-west, and run at the rate of two or two and a half miles an hour. At about a quarter after two, a bright light was made, a point over the starboard bow of the schooner, and in about five minutes after, a green light was seen, from which the approaching vessel was known to be a steamer going to the eastward. While these lights bore about a point forward of the beam of the schooner, that is, north by east, it is supposed to have ported its helm as its red light was seen. It then run heading for the midships of the schooner, on the starboard side. The propeller was hailed twice, but no answer was given. The schooner's helm was put hard a-port, so that the collision might take place as far forward as possible. A voice was then heard from the propeller, saying, "Hard a-port." The propeller, in attempting to cross the bow of the schooner, stem on, at full speed, struck the schooner abreast of the starboard catheads, forcing the forecastle in, glancing forward, separating the stern from the timbers, taking the bowsprit and knightheads away, and turning the bow of the schooner toward the shore. The captain of the schooner saw the propeller approach the schooner nearly at right angles on her starboard bow, and strike her near the catheads. She sunk in sixty feet of water. These facts are substantially corroborated by the other witnesses on board the schooner.

The course of the schooner, as stated by Allen, the helmsman, was west by north, the wind then headed her off to the north-north-west, and then died away so that the boom swung midships. She then lost her steerage way, and swung round about north. In a few minutes the wind rose from the north-north-east, then changed the course to west by north, and shortly afterwards to west-north-west.

The respondent's witnesses are in conflict with those of the libellant. The propeller was on a voyage from Toledo to Buffalo, by the way of Cleveland. Her helmsman says his course was east by south. He took the helm of the propeller about midnight, and remained at it until after the collision; and he says he did not deviate from the course stated more than the sixteenth part of a point, by the compass, until he was ordered to port, to avoid the collision. This statement is corroborated by Captain Dixon, and other witnesses on board of the propeller. In regard to both vessels, witnesses who did not examine the compass must have spoken of the course from the report of the helmsman, or their own general observations.

When the schooner was first descried on board of the propeller, it was one point or a half point on its starboard bow, which shows that the schooner was south of the course of the propeller. This relative position of the schooner is corroborated by the mate of that vessel. He says they made the bright light of the propeller one point over the starboard bow of the schooner, when she was four or five miles from the propeller. When the helmsman of the schooner first saw the light of the propeller, it was at the distance, as he supposed, of about a half or three-quarters of a mile. All the witnesses agree that when the light of the schooner was first discovered, she was south of the propeller. But it is contended that the schooner materially changed her course, which was the cause of the collision.

The witnesses do not differ as to the position of the vessels, when the conflict occurred. The schooner was struck on her starboard bow, so that the vessels, if not at a right angle to each other, must in some degree have approached that attitude. But which vessel was out of its path, or whether both are chargeable with a deviation, is the point in controversy. If the propeller were to the northward of the path of the schooner, and attempted to cross it, the collision might occur; and so if the schooner were north of the path of the propeller, and attempted to cross it, a similar result might follow. And the colliding vessels would appear to the witnesses on their decks respectively as they have sworn.

Captain Dixon of the propeller says, when he first saw the light of the schooner, it bore a half point on his starboard bow. From an observation, he saw the light was carried by a vessel on her samson post, which, as the wind was, would frequently be obscured by her jib. The light very soon changed to the port bow of the propeller; it was unsteady. But the light steadily opened to port, until it made three or four points off the port bow of the propeller. He then considered there was no danger of a collision. He did not order the helm a-port half a point, as was his custom in meeting a vessel, as the schooner was steering clear of the course of the propeller. Feeling chilly, he stepped into his room for his overcoat. He soon heard Austen, the mate, who was on the pilot house, order the helm to be ported; and looking out, he saw the light of the schooner was again closing on the propeller. On passing rapidly to the upper deck, the light on the approaching vessel shone steadily, so that the light must have been to the windward of the jib, and the vessel must have been crossing the path of the propeller. He saw the sails of the schooner, which convinced him that he was not mistaken as to her course; and that

there was danger of a collision. He then rung the bell·to slow, and another to stop, and a third to reverse the engine, all of which orders were promptly obeyed. At this time, he heard an order on board the schooner, "Hard up," which as the wind then blew, was hard a-starboard. When witness first discovered the light of the schooner, she was at a distance of some four or five miles. The other witnesses on board the propeller corroborate this statement. Some of them suppose the course of the schooner was west-south-west, or south-west by west, and others, south-west or south-west by south, which would be a deviation of six points from west by north, the course of the schooner as sworn to by her helmsman.

When a collision is apprehended, it is natural to suppose that the eye of the helmsman is fixed on the approaching vessel, and not on the compass. Under such an exigency, I cannot receive without allowance a statement as to the precise course of the vessel, given by the pilot. He must generally, if not uniformly, speak from the recollection of the general course of his vessel, and from the orders given to port the helm. There is still greater uncertainty, when a witness on one vessel describes the course of another.

The pilots on the respective vessels had the best means of knowing their courses, and it appears from their statements that, at the time of contact, the propeller was running nearly south-east by east, and that the course of the schooner was west-north-west. Had the officers of both vessels desired a collision, I doubt whether they could have brought it about with more certainty than by the means used. The vessels approaching each other very near, the propeller changed her course two points to the right, and the schooner two points to the left, which changes from the position of the vessels could only extend the angle of contact. From the difference in the speed of the vessels, it would require a nice calculation, and no inconsiderable seamanship to bring them into a collision, under the circumstances. Whilst there is no ground to suspect a design to bring about a collision by the officers of either vessel, yet by the evidence, negligence, or a want of skill is shown.

It was the duty of the propeller, as a steam vessel, to keep out of the way of the schooner. Her light was seen by the officers of the propeller, at least, when the vessels were from three to four miles apart. Had her helm been ported, as her captain says was usually done in meeting a vessel, and her course continued, there would have been no collision. The excuse that the light of the schooner on the larboard bow of the propeller showed that there was no danger, is not sufficient. That light should have been closely and continuously observed. There was a breeze of at least five knots an hour from the north-north-east, and the wind was flawy. It was negligence not to guard against the contingencies of the shifting wind, and the

accidents to which a sail vessel is liable. In such a case, the point of danger is not passed until the vessels have passed each other.

After it was observed that the light of the schooner opened upon the propeller, there was sufficient time to avoid the schooner, by putting the helm of the propeller hard a-port. And it is highly probable, had the propeller continued her course, instead of slowing and reversing her engine, she would not have struck the schooner. The damage done to the bow of the schooner, and turning it to the shore, shows that the propeller, when she struck her, must have had a strong headway.

But was the schooner free from fault? I think she was not. Her duty required her to keep on her way, and if she had done so, in all probability the propeller would have passed without touching her. But instead of doing this, on the approach of the propeller, her pilot turned her two points to the left. This increased the danger, and required a greater effort by the propeller to avoid her. And although I think under the rules of navigation above stated, the propeller being a steam vessel, having timely notice of the approach of the schooner, was bound to keep out of her way, which she might have done with ordinary care; yet the schooner cannot be held faultless, as she deviated from her course, and, in some degree, contributed to the collision. The decree of the district court, which held both vessels to have been in fault, is, therefore, affirmed with costs.

I take occasion here to state my view of the rules of navigation, as given by the trinity masters and sanctioned by the supreme court. The trinity rules were designed chiefly, to govern vessels in the river Thames; and that their observance has been salutary in the navigation of that river, is undoubted. And the same rules are applied, especially in this country, to sea and lake navigation. But, from the experience I have had in collision cases, I am convinced they are defective. The defects consist in the conditional application of the rules. As, for instance, "The vessel that has the wind free, or sailing before or with the wind, must get out of the way of the vessel that is close-hauled, or sailing by or against it; and the vessel on the starboard tack has a right to keep her course, and the one on the larboard tack must give way or be answerable for the consequences." Now the duty here enjoined depends upon the relative position of the vessels; and the masters of the vessels must decide. If the position of either vessel do not come within the rule, it is not obligatory on such vessel. The safety of the vessel, the property on board, and the lives of the passengers, depend upon the decisions of the masters of the approaching vessels. There is but a moment for deliberation, and the danger is imminent. No persons who cannot look upon such a scene calmly, can act wisely.

The rules declare, "When two vessels are approaching each other, both having the wind

free, and consequently the power of readily controlling their movements, the vessel on the larboard tack must give way, and each pass to the right." But what is to be done where the masters on the respective vessels differ as to which vessel is on the larboard tack, and where both vessels have not the wind free? Again it is said. "The same rule governs vessels sailing on the wind and approaching each other, where it is doubtful which is to windward." The masters must solve this doubt.

But it is said, "If the vessel on the larboard tack is so far to windward that, if both persist in their course, the other will strike her on the lee side, the vessel on the starboard tack should give way, as she can do so with greater facility and less loss of time and distance than the other." May there not be doubt whether the vessel on the larboard tack is so far to the windward, that if they persist in their course the other will strike her, and if so, is the vessel on the starboard tack to give way? And again, "When vessels are crossing each other in opposite directions, and there is the least doubt of their going clear, the vessel on the starboard tack should persevere in her course, while that on her larboard tack should bear up or keep away before the wind." Here is a doubt to be solved, as to which there may be a difference of opinion.

It should be recollected that these rules must be often acted upon at night, in a rough sea, when nothing can be seen of the approaching vessels but their lights; and unless there be a concurrence of judgment in the masters of both vessels, an attempt by one of them to follow the direction, without the concurrent action of the other, is more likely to produce a collision than to avoid it. In almost every case of collision that I have investigated, the master of each vessel has mistaken the position and course of the other, and when a collision occurs, the one vessel is charged with having changed its course, and run into the other. Such is the case now before me.

In my judgment a rule of navigation to be effective, must be simple and absolute. It must be so plain as not to be mistaken by a man who knows his right hand from his left; a rule which may be carried out in storm and darkness, if the lights of the vessels be perceptible: a rule with exceptions, practically, is no rule. If an exception be made, I have investigated no case of collision where it was not relied on as an excuse or justification. I speak of cases where thousands of lives have been jeoparded, and hundreds have been lost.

It appears to me the following rule, if observed, would be effectual to prevent collisions. "Vessels approaching each other from opposite directions, shall turn to the right." And that this rule shall apply to all vessels, whether propelled by steam or wind. If it be objected that a vessel close-hauled or

sailing against the wind, may not obey her helm, I answer that the master of the approaching vessel can be in no doubt as to the intention of the vessel so situated. Almost all collisions which occur, are attributable to doubts as to the course of the approaching vessel. Make this course certain, without condition, and the evil will be remedied. If a steamer, from any cause, should be unable to turn to the right, her engine should be stopped, until the approaching vessel shall have passed. If two steamers are moving in a direction so as to cross each other's path, and they should come so near as to apprehend danger, the engines of both should be stopped. No man who stands upon the deck of a sail vessel or steamer, can be so ignorant as not to understand and carry into effect the above rules, and if this were done, I am persuaded that the collisions which so often occur would be avoided.

NOTE. As to duty of steamer in approaching a sailing vessel, see The Pilot [Case No. 11,168], and cases there referred to; Baker v. The City of New York [Id. 765]; Wakefield v. The Governor [Id. 17,049]; Pope v. The R. B. Forbes [Id. 11,275]; The Wings of the Morning [Id. 17,872]. That a vessel having the wind free must give way to one close-hauled (The Emily [Id. 4,453]), and without regard to their respective tacks. The Blossom [Id. 1,564]). Where a steamer discovers the light of an approaching sail vessel, and then loses sight of it, it is her duty to check her speed, and even to stop if need be, until she again discovers the light. The Illinois [Id. 7,002]. A sailing vessel discovering the lights of a steamer nearly ahead, on a dark and cloudy night, has no right afterwards to change her course, on the idea that she has not been seen by the steamer. The Scotia [Id. 12,512]. In the case of The Osprey [Id. 10,606] is a full discussion of the law of collision and the duties of approaching vessels; also in The New Jersey [Id. 10,161]. For an elaborate discussion of the law of collision, the rules of navigation, lights, and signals, duty of steamers and sailing vessels, see 1 Pars. Shipp. & Adm. 525–595, and voluminous authorities there cited.